Samuel Q. Richardson, as counsel for defendants in error, presented the following petition for a re-hearing.
With due respect to the court and its deliberations* I premise that the opinion rendered in this case, if adhered to, will certainly establish a new era in the ju-. dicial settlement of the land claims of Kentucky. Ia subsequent and similar cases, it will not only be referred to as an authority for changing the settled practice of the inferior courts, but, may be regarded by many as a cause of increased litigation, where the legislature of the state has been for years endeavoring to bring it to a final close. Let us appeal to its principles and mandates, in reference to former decisions on the same subjects, and see how far these remarks may be correct.
Iam not disposed to warp the investigation of this case from its proper direction; or, to enlist against the opinion of the court, the well founded prepossessions of the country in favor of the fixed occupants of land, who, derive their right from the commonwealth, and have taken possession under the belief that their title would guarantee them security in the enjoyment of their homes. But, as our entire system of legislation, on this subject, seems to. have been disregarded in the decision, though no doubt unintentionally, and its principles and salutary effects likely to be impaired by the new doctrine that has been announced by the court, it is certainly not improper that we should fop a moment,, enquire what this system of legislative policy really is% *271 what its operations on the community, and how far it has been heretofore sustained by the judicial tribunals of the state.
Petition,
It would be needless at this late day, after the ject has been so frequently and fully investigated, to go into an inquiry concerning the origin dnd history of our land claims. I consider it necessary, however* to advert to a few of its leading principles and facts, as illustrative of the real character of the present case. We know, that the soil within our state limits has been appropriated in right by our citizens at large, in virtue of warrants of authority for this purpose, issued and sold by both the states of Virginia and Kentucky; that, the land thus appropriated, bearing no proportion, in quantify to the amount of warrants that were issued, necessarily led to controversies betwixt opposing claimants, who had lain different warrants on the same land. This first cause of controversy, again produced various derivative contests, touching the manner of location, the forms of possession, and the natute of testimony that should be admitted, for and against those who claimed adversely to each other. Ilcnce, our land litigation commenced with the first settlement of the country; and for many years thereafter, furnished almost the exclusive subjects of controversy’ known to our courts. As the lands increased in value, this litigation became metre deep and pertinacious; until fit length, its ruinous consequences on the growth and prosperity of the state, as well as on the fortunes and happiness of private individuals, demanded the serious and firm interposition of legislative authority. We find that the very first subject, which engaged the attention of the first legislature that met in Kentucky, was that of our land law. Public policy, as well as private interest, dictated but one course to be pursued. Therefore, a system of legislation was then commenced with a view to bring those land controversies to a final close, as fast as might be compatible with the situation and rights of opposing claimants. All the enactments of our legislature, even down to the present day, have been steadily directed to the same object, and have uniformly received the concurrent aid and'authority of all the courts of jus fice, in their intended operation»
Petition,
Though our land titles in this country have all been derived from the same source, they are not in the slightest degree connected with, 'or dependent upon each other. Opposing claimants, who are asserting ' right to the same land, have been judicially pronounced equally meritorious, and may each prosecute his claim with good conscience, because, in á legal point of view, one cannot be presumed to be encroaching on another. They have acquired thé authority of (he. same government to enter and appropriate to their exclusive use.; and therefore, one who is in the possession and enjoyment of land, in virtue of a warrant from the commonwealth, so far from supposing that another whp claims it has better right, may legally indulge the opposite belief, as it cannot be so presumed that the government had made conflicting grants of the same thing. This legal inference, which the actual and bona fide occupant has a right to dra\V from his situation, has been converted into a settled principle, in our system of legislation on this subject. Hence, our occupant laws, statutes of limitation and various other enactments, all for the defence and protection of the actual settler. Although some of those laws have been cried out against, even by some of our own citizens who were interested in keeping open the doors of land litigation, and opposed by many others on the ground that they were unjust, in violation of our compact of separation from Virginia, and unconstitutional, they have all still been supported and carried into operation by this court, ilas compatible with the situation and relative rights of opposing claimants.” In passing those laws in favor of occupants, there was no violation of the rights of other claimants, as the legislature went no farther in their favor, than .they, from their situation, had a legal right to presume for themselves. Our occupant and limitation laws, simply discriminate betwixt the nature of the claims, and the relative situation of the .claimants. But, whilst all the land claims of the country have been considered equal in point of merit, as to their origin and the good faith and integrity with which they may be asserted, the situation of the occupant who has derived title from the commonwealth, has given him a preference, because as we have noticed, both the law' aná *273 Une general principles of right and wrong, indulge a presumption in his favor, ft is upon this ground, op possession, that he has received the aid of legislation to sustain him; and it is upon the same ground, that this court has decreed hirh (he conscientious use of all legal means to defend his right. It is true, this position id favor of the occupant, has been strengthened by the policy of the country in putting attend to a series of most expensive ánd destructive litigation among us; but that policy itself, with the reasons which demanded it, had necessarily to centre in some principle of preference, in favor of the one party of the other, and surely, none can be conceived more consonant to law or justice, than that which has beeii -adopted.
Petition.
As to the operation and effect of this legislative system tin the community, it can with truth be said, that it has more than fulfilled the expectations of those tvho designed it* It has already given comparative, -safety and repose to the people, on the subject of their land titles; and, as has been correctly remarked by this court in a previous case, aided by time, it will continue to prove the safest and swiftest judge in ridding our courts of a species of litigation, without example in its private injuries, except we consider its consequences as a public evil.
Should this system be now abandoned, or eyeh encroached on, in either the legislative or judicial proceedings of the state? It taay bfe replied; this is a matter that need not' be considered here; as no Such intention has been manifested bv the court in the present case; and, that what has been already said on the principles and policy of our laud law, is gratuitous and unnecessary, as the opinion rendered in this case; impeaches no principle or statute bf thfe legislative system to which I have referred. It is true, there iá nti positive statute of the state impeached in the decision of this case; nor do I suppose the court would intentionally violate an act of the legislature within its constitutional sphere. But, in cases like this, which have been commenced and carried through all the courts in reference to the settled principles of state policy on this subject, the statute book is not the onty authority to be consulted. This court; since its co$- *274 stitulional organisation, by a series of decisions, has been proceeding with the legislature, step by step in all the measures adopted by the latter to settle the land disputes of the country, until our fixed rules and doctrines upon this subject, may be said to partake as mijch of judicial, as legislative authority. It is to the courts that the legislature has looked to perfect the system, and accomplish this important work. Legislation would amount to hut little on many subjects, if the mere letter of the law was alone regarded. It is the principle and policy of our statutes, on this subject particularly, which should receive our careful regard,when it is designed to give them foil and competent Operation. Such hatfe been heretofore the grounds ■ of adjudication on which this court has acted; and hence, in cases like the present, we find many rules of decision laid down in our reports, in furtherance of positive law on the sartie subjects. If is those príjí-ciples and rules, now of acknowledged authority, from which I respectfully contend the opinion rendered in this case, not only departs, but in effect, mainly counteracts and destroys.
Petition.
I will again.detail the proceedings in this case, with a view that its true character may not be mistaken, and that it shall appear whether it differs so materially from others, in which contrary decisions have been given, as to authorize the new doctrines concerning it that have been announced by the court.
Joseph Simpson, the ancestor of the present defendants, claimed the land in controversy, in-virtue of a patent from the Commonwealth of Virginia to Miles Hunter; dated the 9th of June. 1787, and of a deed from the register of our land office, of date the 14th of September, 1802. Hunter, on the 27 th of August, 1784, before the date of his patent, bound himself by penal bond to convey the land to James Knox and Hubbard Taylor. Ón the 14(h of January, 1804, Knox and Taylor, for a valuable- consideration, assigned this bond to Simpson, who entered and settled on the land as early as 1796, though he acquired no title previous to 1802, the date of the registers deed, and 1804, the date of (he assignment df Hunte'r’s bond to him by Knox and Taylor.
Petition*
'Samuel Shannon, the ancestor of the plaintiffs, Maimed the same land as devisee of William Shannon, to whom a patent issued therefor, of date anterior to that of Hunter, under which Simpson claimed.
Jin April, 1804, Joseph Simpson filed his bill in the Shelby Circuit Court against Samuel Shannon, with a vie\y to confirm his title by compelling a surrender of the ejder grant. Shannon answered denying the validity of Simpsons equity, and relied on his own superior legal ¡title, &c. In May, 1807, Simpson died, when the sujt was revived in the name of his heirs; and Shannon deceased some time iu the year 1813,, when his heirs were made parties defendants also.
In April, 1815, the heirs of Shannon brought their action of ejectment against the heirs of Simpson for the land in controversy, ¡n June, 1815, pending this ejectment, and after the suit in chancery as aforesaid had been submitted to the court for decision, it was ordered on the motion of the complainants that their bill be dismissed without prejudice, in February, l{51fi, Shannons heirs obtained judgment in their action of ejectment. Shannon’s heirs, having failed to order execution on this judgment in proper time, found it necessary to revive the same, for which purpose they issued a scire facias against the heirs of Simpson on the 14th of April, 1820. In the proceeding on scire facias there was considerable delay and controversy betwixt-the parties; a judgment, however, of revivor was pro-, nounced in favor of the plaintiffs on the 2d of October, 1823. From this judgment the defendants, Simpsons heirs, appealed. On the 9th of June, 1824, the judgment on scire facias was affirmed by this court, and the opinion certified to the court below in thirteen days thereafter.
On the 30th of June, 1824, Simpsons heirs moved the circuit court to appoint commissioners under the occupying claimant laws, to value improvements, &c. On the 3d of July succeeding, commissioners were appointed, Shannons heirs objecting thereto. At the jame time they moved the court to amend their tfe-, claration by extending the demise therein, which they alleged was about to expire. To this motion Simpsons heirs objected, and the court took time to coa- *276 aider, &c. At the September term following (1824; the commissioners appointed on the 3d of July proceeding reported, whose report,' on the motion of Simpsons heirs, was quashed by the court for irregularity in their proceedings. At the same time, Shan-nons heirs again moved the court to extend the demise, on the ground that the defendants had already produced unnecessary delay by their appeal from the judgment on scire facias, and the appointment of commissioners to valuó improvements, and that they might still produce farther delay, until the demise laid in their declaration would expire; and that ifit did expire before the said execution by ha,here facias, their right of entry would be barred by twenty years unin-teirupted possession in their adversaries. This motion was overruled by the court.
Petition..
On the 9th of October following (1824) the heirs of Simpson filed their bill in chancery, to which they made Shannons heirs defendants, wherein they allege their superior and better equity to the land in controversy, to which they exhibit all their evidences of title; they set forth all the proceedings at law against them, and show that they are likely to be turned out of possession immediately, unless the plaintiffs in ejectment are restrained by the timely interposition of the chancellor. They pray a perpetual injunction of the judgment, and a final decree for the land. Upon this hill, before it was filed in the office, an injuncv tion was awarded Jby the justice of the peace designated according to law to take jurisdiction in such cases.
At the ensuing term of the court in February, 1825, the heirs of Shannon answered this bill, arid set forth and exhibit all the proceedings had betwixt the parties up to that date, They charge the complainants, ¡Simpsons heirs, with fraud in each and every step taken by them throughout the controversy, and allege that they unnecessarily protracted the final termination pf the case, with a view that the demise laid in their declaration might expire; that it had expired on the 31st of January preceding, in consequence whereof that they are entirely remediless at Jaw. They make this answer a cross bill against Simpsons j}eirs,''and pray that they be compelled to consent to *277 lengthen the demise, or a decree for the land abso. lately.
Petition,
Simpsons heirs answered the cross bill, in which they deny all fraud as charged, and say that in defending their claim and possession throughout, they pursued no other course than that pointed out by the Jaws of the land. They admit the demise had expir-' ed, and rely on their equity, and uninterrupted possession for more than twenty years, to hold the land. They also deny the power of the chancellor to interfere, and pray that the cross bill against them may be dismissed, &c.
At the September term, 1826, this cause was finally heard on the bill, cross bill, &c. when the court gave a decree dismissing both with costs. From this dc> cree Shannons heirs prosecuted the writ of error how pending.
Until it reached the court of chancery, there was nothing, in the estimation of this court, to distinguish the present from any other common case of ejectment. The demise in the plaintiffs declaration expired, before they were able to have possessory execution of their judgment. They appealed to a court of chancery for relief, which was refused them; and on the case being brought before this court, the decision below has been reversed, and the chancellor there directed to decree to the plaintiffs their writ of possession, unless the defendants consent to extend their demise.
Before I advert to the principles and reasoning on which this opinion is founded, I will freely notice some of the distinguishing traits which the practice of our courts have given to the remedy by action of ejectment, It need scarcely be remarked that this court has long since departed from many of the doctrines laid down in the British authorities concerning this action. In England, it was formerly held that a court of law would not extend a demise in ejectment, even where the parties were hung up by an injunction from the court of chancery; because, as it was said, that would be to alter the record of the plaintiffs declaration, which they would not do without consent; Sec. 6th, Mod. Rep. and the cases there cited. *278 In subsequent cases, however, this doctrine 1ms been overruled, and it is now said llmt, an ejectment being a fictitious action, the demise is mere matter of form, and may be extended on motion of the- plaintiff" at “ any time. The doctrine on this particular subject it altogether different with us, In England the courts will now pven change the plaintiff in an ejectment,- as well as add new parties after declaration delivered. See Rurm. Eject, p. 227 and 228 and notes. This court has often refused to add, new lessqrs of the nominal plaintiff, much less to change the lessor of the plaintiff altogether.. See Mays heirs vs. Hill, 5th Litt. Elliot vs. Bohanan. 5th Mon. Curries heirs vs. Tibbs heirs ib. Dudley, &c. vs. Grayson, VI Mon. There, a declaration in ejectment, may be amended by extending the demise, as well after, as before judgment rendered, Runn. Eject., title demise. Here, this court has expressly decided that no amendment of the declaration byex? tending the démise, is admissible after judgment gendered. See Owings vs. Marshall, III Bibb. As I shall have occasion presently again to notice this case of Owings and Marshall, which certainly has an important bearing on the one under consideration, I will now barely remark in reference to it, that the court there does not consider the demise as mere, matter oj form, but as matter, of substance, and having a direct bearing on the interests of the parties to the suit, I find no case in our reports, where the court has extended a demise even before judgment. The ease of Rogers and Burnet in IV Bibb, wherein the court permitted the plaintiff, before trial, so to amend his declaration as to make the demise subsequent to the date of his title, may be considered equivalent to it. Even that case, however, I think falls short of such a practice; as there, there was a simple change of dates in reference to the accruing of title, which is certainly different from an extension of the term which the plaintiff goes to recover.
P&titioiJ,
The cause of this discrepancy, and increasing variance, betwixt the decisions of our own, and the English courts in the action of ejectment, may now be inquired into. In that country for centuries past, restrictive legislation on the subject of land controversies has haé- nothing to achieve. All the cases iq *279 ejectment there, have been betwixt parties iñg fov the better right, under the same title. Wiih us, we have seen that the cases are ol an entirely dif-fevent character. Individuals claiming adversely, and contending for the same land under different titles, have been constantly striving to turn each other out of possession. We have also seen that the legislature, aided by the courts of justice, has been as constantly restricting the right of entry in an adverse claimant, by limitation law's and other statutes protective of the actual settler. Hence, the latitude formerly taken in actions of ejectment, has been circumscribed, and the proceedings in that remedy made to bend to the legislative and judicial policy of the country. If every plaintiff in ejectment, according to the English doctrine, were permitted to extend his demise at will as mere matter of form, we would find that our statutes of limitation, restricting the right of entry iiv adverse claimants, would in a great degree be counteracted in their operation. An occupant of land might thus be kept in court defending his home, until the right of entry of him who sues would be three times tolled in point of lime. In addition to this, it would have an evident tendency to protract, and even sometimes increase, that series óf distructive land litigation among us under which the stale has so long-groanbd. We cannot then hut see, as we have already to a great extent happily realized, the grounds on which this court has based its decisions in previous eases like the present.
petition '
I will now consider of those parts of the opinion, which, with deference to the court, seem to me to be in collision with both principle-and authority on (his subject. It is said;“when in June, 1824, they (Simpsons heirs) applied’for the appointment of commissioners to value improvements and the plaintiffs in error. (Shannons heirs) objected, unless upon leave given to amend their declaration, the objection ought to have been sustained; but it was improperly overruled through the opposition o.f the defendants in error.” And farther. In speaking of this opposition, on the part of the defendants, to the plaintiffs motion <o amend their declaration by extending the demise, it is again said; “But suppose there was nothing un-tjonscientious in this on their part, &c.” By this Ian- *280 gunge we are not left to infer the meaning'of the court In the first place, it is decided that in the then state of the case, the court below had discretionary control of the demise, and on the motion of the plaintiffs should liave ordered it to be extended; or, have withheld from the defendants their right to the privileges of the occupying claimant laws, unless they consented to its extension. And, at that time, that it was uncon-scientious in the defendants to object to the plaintiffs motion to have their demise lengthened. It will be recollected that the original judgment in ejectment in favor of the plaintiffs was given in February, 1816; that it was revived by scire facias on the 2d of October, 1823, and that the judgment of this court affirming tile judgment of revivor in the court below, was certified to that court and entered of record in the cause on the 23d of June, 1824. All before the defendant moved for commissioners, or the plaintiffs to extend their demise. 1 will now again advert'to the case of Owings and Marshall in III Bibb, and that it may riot be misconceived, will present it in externo.
Petition,
“Owings vs. Marshall.
“Chief Jusfice Bovle,
delivered the opinion of the court.
“Marshall recovered a judgment its ejectment against Owings, and the latter obtained an injunction by which the proceedings on the judgment ■were stayed, until the demise in the declaration had expired. The injunction being then dissolved, Marshall applied for and obtained an order amending the. declaration, by enlarging the demise from ten to twenty years.
From the order thus amending the declaration^ Owings has prosecuted this appeal.
The only question is, whether the amendment was permissible, or not?
Amendments of the record.in some respects are without doubt allowable, as well after as before judgment; but there isa manifest distinction, both in prin^ ciple and practice, with regard to the nature and ex? tent of those amendments which may be made before* and those which may be made after judgment. While the cause is depending, the record is within the power of the court, and amendments are allowable atitsdis-. *281 ¡¡sretion. In the exercise of this discretion, the court will always be careful equally to protect the interest of both parties. At. the same time that one party is permitted to correct such mistakes, or supply such omissions, as the exertions of ordinary skill and diii gence cannot prevent, care will be taken that the rights of the other shall not bo prejudiced. An amendment in mere matter of form is allowed of course, but if the amendment be in matter of substance, it will be permitted only upon such equitable terms, as will secure the rights of the adverse party; and in such case no injustice can be dot e: for the cause being still in a course of litigation, and the parties before the court, they will have a fair opportunity to contest the claim, or defence, in the new attitude in which it may be pre-> seated by the amendment.
Petition.
Rut with regard to amendments after judgment, the case is widely diffluent. The court then ceases to have any discretionary power over the record; the cause is at an end, and the parties out of court. Every reason, therefore, which justifies an amendment in matter of substance, before judgment, operates against it. after judgment. As has already been observed, amendments after judgment are in some respects allowable, but if is only in cases of clerical misprisions; and with respect to those, it is an invariable rule that no amendment can he made, unless there be something, in tiie record to amend by. In this case there is no pre-tence that the amendment was made to correct a clerical misprision; nor is there any tiling in the rpcord by which the amendment could be made.
Were the amendment, therefore, in a mere matter of form, as it is contended to be by the counsel for the appellee, it would not follow that it is proper. But it does not appear to be of that description. The enlargement of the demise, after judgment, is the enlargement of the judgment; for the judgment is entered for the term unexpired, or yet to come. That an amendment of this sort, might produce the mo«t flagrant and palpable injustice in many cases, is evident.
An ejectment is a remedy, not only to recover lands Jaimed in fee simple, but wf- >-e the estate is only for. *282 life, or years. Suppose (hen an ejectment be. brougli# where the lessors title is only for life, or years, and a judgment be recovered; but before execution, the term laid in the declaration, as well as the lessors es-. tate,.expire; in such case, an enlargement of the demise, laid in the declaration, would give the lessor of the plaintiff a right to take the possession of the land,, when in tr.gth he. had- no.,title,, os: interest in it whatever.
fetitiop.
if an amendment enlarging, the term be inadmissible in the supposed- case, it must be inadmissible in every other. For whether the lessors title in any case, is for a longer term, or greatest interest, than the term laid in the declaration, cannot appear otherwise than by a trial of his title; and this could be done only in the ordinary mode of trying titles.
We are, therefore, of opinion the amendment in this case was not permissible.
Order reversed.”
Either this decision, or the premises in the preceding,extracts from the opinion of the court, must be wrong. They are entirely at variance on a material' point, and cannot be reconciled together. It need not, be said, that the foregoing case, and the one under, consideration, were differently situated; or, that the court has not decided, in this case, that it is competent for. a court of law to lengthen a plaintiffs demise in ejectment, after, judgment rendered in his favor, in the, opinions of a court of errors and revisa), I can distinguish no difference where a principle, or rule of legal proceeding, is settled, on which a case under consideration is made to turn; and where it is equally settled, as merely incidental to and in aid of a different point, on which the decision may be made. In either case, the principle, or rule of legal proceeding as’ iai^J down, receives from the court the same force and authority. Now, the present case did not turn on the application of the plaintiffs in the court below to have the demise in their declaration lengthened, after judgment rendered in their favor; yet, this court has said in its opinion herein, that when the defendants moved in the circuit court for c ommissioners to value improvements, gild the plaintiffs objected unless upon *283 Ibave given to amend their declaration by extending their demise, that the objection of the plaintiffs ought to have been sustained; and that it was improperly overruled through the opposition of the defendant's, and which opposition was imconscienlious in them. Does not the court hereby as fully decide, that the court below had judicial control'd'f the demise after judgment, as if the 'caSe bad turned entirely on that point? Is not the foregoing declaration of this court, that the defendants should Have been refused the appointment of commissioners, unless they consented to an amendment of the plaintiffs declaration, intended for, and calculated to receive the observance'¿f all the inferior cohrts in similar cases? As rriurh so I should suppose, as if forming in itself a settlement of the only point in issue;
Petition.
I think it will bé acknowledged that the principle,, Or rule of legal proceeding, decided in this case, and that of Qwings and Marshall, is precisely the same; In that case, the demise had expired before the application to the court to extend it In this,case, it was still running, though about to expire. Both applications were made to a court of law, and after judgment in ejectment had been pronounced. In OwingS and Marshall, the court does not even advert to the fact that the demise had expired before tiie application was made to lengthen it, or that it would have been competent to extend it had it not expired, but decide the case on the ground that the. court below bad no power over the demise after jddgment. In this caso, the opinion not only confers the discretion bn the circuit court to edntrbl the demise after judgment, but charges it to have been unconscimliom in the defendants not to havo consented to its extension. Il may be said, that the court did not intend to decide in the present rase, that the circuit court had unconditional power to lengthen the demise, when the application for that purpose was made by the, plaintiffs; but, that the opposite parly should have been laid under terms to consent to that motion, before commissioners should have been appointed at their instance to value the improvements. Although, accoi ding to the tenor of thé opinion, this would be. beggii g the question, still it \Vould not change or van in the, leasi, the principle that has been thus differently settled in the two cases,; *284 R the coart below had no power, after judgment, ■exreod (he demise absolutely, itcertainly had as little, tocomoel the. defendant' t‘o consent to it, by withholding from them their legal rights. They either had, or had not, a right to commissioners under the occupying claimant laws'. Those laws specify the character Of defendants on whom their, privileges shall be Conferred. If Simpsons heirs cante within their provisions, the court had no power to debar them of the right. If they did no’,' it would have been granting them a privilege to which they were not entitled, in lieu of their consent to an act, which the court hadno’ judicial power to perform. Consent, in a case like this, cannot legalize errot. The court below either' had, or had not, the power to lengthen the demise after judgment in favor of the plaintiff! If it had not, ■and it has certainly been so decided in the above case, then the act would have been extrajudicial; and no bargain, or consent, of a' party,- enforced under conditions imposed by the judge, could have legalized it. Il would not have been a case of voluntary consent, bu’ of illegal coercion. How then Can Simpsons heirs be justly charged with having acted unconscientiously, in opposing what this court has heretofore said their adversaries had no right to ask ? Yet, this is one of the grounds on which the charge of fraud against them is based.
petition.
According then to the cáse of Owings and Marshall, there was no lime subsequent to February, 1816, when the plaintiffs obtained their judgment in ejectment, at which they had the right, or the circuit court the power, to exiend their demise. From that time.* they >were remediless in a court of law, and compelled to stand by their demise had it been laid for only one, instead ot ten years. They had gone in their ejectment for a lease of ten years only, and after having judgment for their term unexpired, being all they claimed, they had no rignt to enlarge that judgment,With a view to ex cutio.> under it for a term of twenty years. The scire facias does not change the case. For thiit proceeding' was based upon the judgment as then existing of record, which it sought to revive Dirr- ly for the purpose of having execution under it.I> was still a judgment, though the writ oí habere fa~ das possessionem couid not go without a revivor.

féúüoo.

But, the court has said in its opinion, that the heirs of Simpson unnea ssariiy and fraudulently delayed the ca*e, with a view that the demise might expire before the plaintiffs could have execution of their judgment; that this fraudulent procrastination has realty brought them into their present situation, and therefore, that it is meet and proper they should be restored to the advantages they held under their judgment at law; before the demise had expired.
The plaintiffs obtained their judgment in ejectment, tn February, 1816. No execution having issued thereon for a year and a day, they found it necessary to revive, and for that, purpose, issued a scire facial «gains1- the defendants, on the 14th of April, 1820. Their declaration in ejectment, contained a demise for ten years, commencing on the 31st of January, 1815: so that when they issued their scire facias,• more than one half of that term had expired, and it still running. . Was this delay produced by the fraudulent procrastination of the defendants? Are they now to be made answerable for the consequences of this neglect in the plaintiffs? But the opinion says there was still, time enough left them, had not the defendants made unnecessary opposition to the after proceedings? It may be answered there was time enough too, betwixt the date of the judgment in February, 1816,and the issuing of the scire facias in April,-1820, had they diligently pursued their remedy. The opposition made by the defendants to the scire facias,-as far as the interest of the plainliff-uione is regarded, mav be considered improper, as it was against their right: to recover. But what should ttie defendants have done; fold their arms and invite the plaintiffs to come into their house and turn them out, or defend themselves in the possession of their home, under the laws that were designed for their protection? Suppose the demise had expired, would the defence to the scire facias have been then considered unnecessary and fraudulent? No. Why not? Because no event would then have happened to make it so. How then can the correlative relation of the defence which the defendants had a legal right to make, and the running of time under the demise, which surely they had no power to stop, make together a fraud, when neither of itself can be so considered? But the court *286 infers that the defendants still looked to the demise^ while they were persevering in every means of legal resistance, find secretly hoped that they might be enabled to continue the.ir defence until it should expire. This is certainly a refinement in the ethicks of land litigation, even the “most Sublimated morality,” much less the cdurtá and legislature of our country has never heretofore obtained.
Petition.
The .opposition made by the defendants.to the ‘scire facias, viras precisely such as might hfive been expected from the nature of the case. I refer to our books of reports, and to the entire judicial history of OUr land controversies; and venture to say that thpre cannot be found a c;ise similarly situated, and of equal importance to this; whereiu the means of legal de-fence have not been as bountifully and stubbornly employed. It arises from the very nature of the controversy, and the intricacy, uncertainty and long continuance of land, causes, has been proverbial in the country since the first court was opened. Could the plaintiffs have expected any other defence than the one made, had their demise been fdf fifty, instead of ten years? Let the records of our courts answer this question. No plaintiff in ejectment has everyet succeeded, until every legal defence against him was exhausted. Why then make the defence in this particular case bear upon the length and running of the demise, when it is found not to have been unusual in point of time, or illegal in its means and practice? There is a single inquiry, which I must think entitled to decisive influence (o' be made here. Which was most unusiinl, this shortness of the demise, or the length of the defence? Excluding more than four years, which time the plaintiff-, suffered their judgment to sleep, leaves only betwixt five afid six. for them to have commenced their suit in ■ the circuit Court, prepared it for trial, and carried it through all its stages of legal adjudication; and this too, when its progress was delayed by the scire facias to revive. It is admitted by the court, as it must be by every lawyer and litigant, that the demise was unusually Short, and the defence nof extraordinarily long. Must then the' legal defence of him who the law presumes the owner, give place to the anxiety of his Adversary, particularly when it arises from the imperfect'stAte of *287 bis pleadings? Is one litigant bound to regard the interests of another in a law suit, and so to direct his defence, as not to injure the right or demand of his opponent? It seems to me that these questions have been long since settled. In the case of Bowpian and Violet, in IV Monroe, the court says, “over the length of this demise, the appellee, Violet, had no control. It was fixed at the pleasure of Bowman and his counsel, and in doing so, they were at liberty to fix it at ninety nine years, as well as a shorter period. It it was fixed at a period which would not overreach the time that the cause, by fair management, and without fraud, could be kept from a final decision, it was the fault of Bowman, and not Violet, and this error of Bowman, cannot furnish him with any ground for relief.”
Petition.
Now, according to the rules of-this decision, should not the plai. tiffs in the present case, have fixed their demise at a period which would overreach the time that the cause, by fair management, and without fraud, could be kept from a final decision? And further, should they not have diligently pursued their remedy, and if they did not, tan they now have relief on the ground that their opponents unnecessarily protracted theirdefence. It is thought that a view of this side of the. controversy would have settled it against the plaintiffs at or ce, as they stand convicted pf inexcusable laches in “dozing over their case,” and failing altogether to pursure the remedy which the. law had put in their power. They had their judgment in ejectment, in February, 1816. This they suffered to sleep four years and two months, when, on the 14th of April, 18^0, they issued their scieri facias to revive; judgment of revivor in their favor was pronounced in the' circuit court, on the 2d of October, 1823, which was appealed from by the defendants, and the decision of this courtf affirming that judgment was certified to the court below, on the ninth of June, 1824. Were they guilty of no laches in failing to take out execution on their judgment in ejectment, for this length of time, and till they were driven to their remedy to revive? This neglect alone, caused them to lose eight years and four months of their time, having then only one year and eight months, in which to commence their action *288 and carry it through all the courts for final adjudica, tion. For the scire facias was their own proceed* iag, and the consequence of this neglect; therefore, the time lost in its prosecution, is in no wise imputa-hie to the defendants; but to the plaintiffs themselves, But the opinion says, they had still time enough, had no opposition been m-ide to their proceedings; granted. Yet. had either the opinion or the plaintiffs the legal right to presume that no such opposition would be made? Let the former decisions of this court, wherein it is said the defendant? hada right to calculate on all tne advantages which the law might give them, reply to this decision. It is also alh ged that the plaintiffs have been thrown into their present difficulties by the defence of their adversaries. Surely the defendants could not have prevented their suing out px -cution on'their judgment, nor is it even insinuated that they resorted to anv means whatever so to do. Doubtless, had execution then issued, it xvould have been stopped by injunction, as it «as, when it was about to issue in October, 1824. The plaintiffs had a right to proceed at discretion, and in exercising it, they alone are accountable for its consequences. The defendants were no doubt using their means of opposition, just as they were calculated to prove most effectual; and if their defence became more strenuous about the time ’the demise expired, it may be fairly said to have been produced by the plaintiffs themselves. As defendants, and .maintaining their rights in that character as parties liligants, they could move only, as their adversaries proceeded. I( was neither their interest or province, to press the case, much less to take it up and manage, it against themselves.
Petition.
Then, considering of the course and present situation of the plaintiffs, in reference to the length of the demise as-fixed in their declaration; the period they suffered their judgment to sleep. Or, the whole time of eight years and tour months which they lost by failing to take out execution; they are equally in default, and come within the rules of decision laid down in those cases touching the negligence of parties litigants. “If a party becomes remediless at law, by negligence, he shall not he relieved in equitv.” Or. if he has heen negligent at law, and claims equitable relief on the *289 ground of casualty, accident, &c. which is shewn, still it will be refused him; because, his own conduct has not been free of censure, in which case it is impossible for the chancellor to say, whether it did not entirely, or as to some part, produce the difficulty of which he seeks to be relieved.
Petition.
I cannot forbear, although it may lengthen this pe* tition, noticing the proceedings in the defence, which the court has pronounced to have been of a fraudulent character; and on which, both the right and the reason of equitable jurisdiction, are made to rest.
First, the opinion adverts to the original suit in chancery of Joseph Simpson vs. Samuel Shannon in the Shelby Circuit Court, and suggests that “why the suit in chancery instituted in 1804, was abandoned, and a dismission of the bill suffered by the complainants, who are now the defendants in error, we are not enabled to determine.” Although it is admitted in the opinion, when the suit in chancery was dismissed, that the present defendants had no intention of procrastinating the ejectment case, with a view that the demise should expire; still, their dismissing that suit, pending the other, seems to have been thrown in as a make weight against them. I certainly calculated on no difficulty here; but, supposed that the reason of the defendants for this proceeding was so palpable, as to free them from the least imputation for having adopted it. Every plaintiff in ejectment recovers upon the strength of his own title, and not the weakness of his adversaries. Had then the right of the parties been decided in chancery, before the ejectment was tried, Simpson’s heirs would have lost all the chances of their defence at law. Had Shannon’s heirs failed in their ejectment, there would have been no necessity for a suit in chancery against them, as possession under the statute would have quieted their title. Should they succeed, as they did do, then, after having enjoyed their advantages as defending litigants, Simpson’s heirs had a right to go into chancery for relief, without having their equitable right in the least impaired. But, their bill was dismissed without prejudice; which relates not only to a future prosecution of the suit, but *290 to the character of the proceeding.itself. How then can this court make it a ground of prejudice in the present case?.
Petition.
The second charge of a fraudulent character against the defendants, is, that they refused consent to an extension of the plaintiffs demise, when moved for before the circuit court in June, 1824, eight years after the judgment in ejectment had been rendered. This charge has been certainly refuted under authority of the case of Owings and Marshall.
The third ground of fraudulent inference against the defendants, is, that “after the report of commissioners was quashed in the fall of 1824, and they had permitted the court to adjourn without making any motion to appoint the same, or other commissioners, thereby inducing the plaintiffs to believe that they had abandoned the defence, and that no farther obstacle would be thrown in the way, to prevent them from acquiring the possession of property, to which their right had been demonstrated at law and in chanceryNow, the inquiry is seriously made; were the plaintiffs either deceived or misled, by any thing at this time said or done by the defendants? Had they a right, at the time referred to, to indulge the belief that they had abandoned their cause? Are not the inferences, that the defendants intended to deceive, and that the ■plaintiffs were deceived, alike forced and gratuitous? It seems that this matter must have escaped the attention of the court, as the opinion certainly indulges more in favor of the plaintiffs, than they did for themselves. On the 2d of October, 1824, the very day on which the commissioners’ report was quashed, the plaintiffs in ejectment moved the court below to extend the demise on the following grounds: 1st. Because the defendants had appealed from the judgment on scire facias, and thereby delayed the proceedings. 2d. Because of the appointment of commissioners under the occupying claimant laws, which delayed them in taking out execution. 3d. Because ‘the demise in their declaration would expire in January following, and the defendants would hinder and delay the plaintiffs, and thereby prevent them from obtaining possession of the land, for which they had obtained a judgment, until the demise in their declaration would ex *291 pire. 4th. Because if the demise expired before they got possession under their judgment, their right in a second action would be barred by more than twenty years possession in the defendants, and those under .vhom they claim. Here the plaintiffs expressly avow their fears, as a ground of their motion to lengthen the demise. How then can it be inferred that they were induced, by the course of the defendants, to believe the defence was abandoned? Will the court subject the defendants to the imputation of having thus deceived the plaintiffs, and make it one of the reasons for deciding against them, when the plaintiffs themselves disavow the idea of having been deceived? I should suppose not. It would not only be creating facts unknown to the cause, and of course not alleged in the pleadings, but carrying the doctrine of construc-Live fr~vd into~the wildest re~ions of speculation. As an additional imputation on the conduct of the defendants, and with a view to show that they were guilty of fraudulent delay in injoining the plaintifTh judgment at law at the time they did, the opinion says that, at that thne, the plaintiITh "right had been demonstrated both at law and iii chancery." When was that demonstration in chancery made? In the original suit in chancery which was dismissed in June,. 181 ~? We have seen that suit was dismissed without a trial. Was it when the bill of injunction of the defendants, and cross bill of plaintiffs, were both dismissed in September, 1826? That was two years after the injunction was granted; and yet it is alleged the plaintiflui had dc. monstrated right to the land, both at law and in chan~ cery, before the injunction was applied for, and this assumed fact also, is thrown into the scale against the defendants.
Th~tition.
A fourth ground of fraud in the course of the defen~ dants, is, that they did not apply to the circuit court, which was in session, for their injunction, but tojus-tices of the peace, who had been appointed to grant injunctions in particular cases. Upon this point the opinion says, G~But it was unconscientious, after resist~ ing the motion to extend the demise, and having succeeded in their opposition, to postpone their applica-tton for an injunction, until the chancellor, who understood the situation of the opposite party, had retired, and then to obtain it from magistrates. Such *292 conduct carries on its forehead the legible and' indelb ble stamp of fraud! It was an imposition on the magistrates; the bill'exhibiting an imperfeet and false picture of the true situation of the controversy. The defendants obtained from them, through their credulity and want of information, an order, which they could not have obtained from the court. This too seems to have been done in the absence of the plaintiffs in error, and “without any intimation to them, of an intention to make such an application.1’ Let us now consider of this conduct, which is-thus pronounced to carry on its forehead those legible and indelible-stamps of fraud! The order quashing the commissioners report,, and the motion to extend' the plaintiffs demise, were both made on the 2d of Octoberr 1824. The- circuit court, as appears from the law fixing and limiting the time of its session, was then about to- close its term. The injunction was granted by the magistrates on the 9th of the' same, month, in one week thereafter. Was there here any delay, beyond what should be considered a reasonable time for the defendants to-prepare their billin? They had to act by counsel, whose other engagements in court, no doubt prevented an instantaneous preparation of the bill and exhibits. Suppose the injunction had been granted by the circuit court; would one week have been considered unusual for counsel and preparationÍ Why then say that this préparation was intentionally postponed, when the circumstances of the case made it necessary to apply to magistrates? The fact is, though it does not appear in, the record, that the circuit court did adjourn on the 3d of October, the very next day after the report was quashed and the motion to extend the demise had failed. Had not this fact as well be presumed by the court, as that the defendants had a fraudulent intention, particularly as the opinion takes it for granted that the court had adjourned on the 9th of the month? What motive could the defendants have had to avoid an application to the circuit court for an injunction? Had they failed to obtain it on the terms they desired, they were not thereby precluded from applying to the magistrates, as they did do. Had the circuit court even the power to lay them under conditions to an injunction, of which I shall presently consider, they had no reason to dread *293 an application there, as they could have lost nothing by it. But, it is also alleged against them that they obtained the injunction from the magistrates “without any intimation to them, (the plaintiffs) of an intention to make such an application.” Now, why is this fact also presumed, as it does not appear from the record whether the plaintiffs were informed of the application, by notice or otherwise, or not? The effect, however, of this presumption, were it even supported by the record, is entirely destroyed by the provisions of the law; for the acts of 1818 and 1820, conferring the power on justices to grant injunctions, do not require a complainant to notify a defendant of such an application. How then can a failure to have done so in the present case, be imputed to the defendants as a badge of fraud in their proceedings?
Petition.
petition
The other ground of objection, as contained in the foregoing extract from the opinion, certainly carries with it matter of more serious inquiry. I consider it so, because a postponement of the application for an injunction by the defendants for the space of one week only, is not the only charge against them; but, it is alleged, as an additional evidence of their intention to deceive, that they then directed their attention to the magistrates; and on the whole proceeding as adopted by them, the court remarks, “Such conduct carries on its forehead the legible and indelible stamp of fraud.” Have we not seen from the nature of their case, as well as the press of time, that the' defendants were driven to this resort? They had, in managing their defence, either then to obtain an injunction, or surrender possession. But why was the power to grant injunctions conferred on justices of the peace? We know it was because that in many cases-of exigency, in the absence of the circuit judge the rights of parties would suffer, were not co-ordinate powers with his'on.that subject, lodged somewhere. The legislature has thought fit to confer these powers on justices of the peace, not thinking I should suppose, that this court would presume in a settled opinion that, as a, body of magistracy in this jurisdiction, they were ig-noran? or incapable. I am not disposed to pervert either the language, or meaning of the court on this subject. They are both too plain to be misunderstood. Is it a rule of either law or equity, to presume any offi *294 cer, who is called by the'government to perform a particular public service, ignorant of his duty? In this case, the court has not only so presumed the magistrates, but in terms, has pronounced them ignorant,.. "and unqualified to perform the duties incident to their office! It has gone further. An application to magistrates to exercise a power which they hold, instead of applying to the judge himself, has been construed into a corrupt intention on the part of the litigant, and set forth, as one of many grounds against him, whereon to construct and build up a case of inferential legal fraud! In what attitude does this place the litigant? The legislature says by statute to him, go to the magistrates, when the circuit court is not in session, L have given them power to grant you injunctions. He-does accordingly; and upon one of those injunctions,, the legal propriety and equity of which does not meet the approbation of this court, it says: such conductin a party litigant carries with it evidences of fraud, as you knew when you went to the j ustices that they were ignorant and incapable, and therefore, we have a right to infer that you meant to deceive by operating on their credulity. This is the import of the opinion, and the ground on which it bases fraud against the defendants in this part of their proceedings. Has not this court the same legal right to presume ignorance in the cir» cuit judges, as in j ustices of the peace ? Should it base any part of a decision on such a presumption, in either case? Our entire body of judicial magistracy must necessarily vary in their stations, offices and duties; and it has always been heretofore considered, in their official relations, that each were competent to their duty, and did perform it. Whatever fitness the remarks in the opinion in reference to the justices, may have to that body of magistracy generally, they certainly upon no principle can apply to the defendants, in the way they have been used. Such a construction, instead of considering the law authorizing justices to grant injunctions of judicial obligation in this court, would convert it into a decoy, whereby parties litigant might be whipt into fraudulent relations, never contemplated or expected.
Petition.
The foregoing are the prominent grounds on which fraud is so liberally charged against the defendants. Were they really obnoxious to this charge, in point of *295 fad, I should feel the greater necessity of defending them against it. Had they controlled the plaintiffs demise, by which they in any manner prevented its legal effect; had they allured them from the vigilant prosecution of their suit, by any false pretences of compromise, surrender of title or the like, and then availed themselves of their present advantage; or, had they resorted to any fraudulent means to obtain the defences made by them to the plaintiffs action, there would have been some show of ground whereon to base this charge. But of this, nothing is exhibited in the record, or alleged in the opinion of the court. The proceedings in the circuit court show that a part of the defendants appeared by guardian ad litem, and of course, under the particular care of the court in using every legal defence. Can fraudulent intentions be imputed to a minor under such circumstances?
petition'."*"
In reference to the charge of fraud, I will here advert to a principle of equity, which has never failed to influence the decision of the chancellor. “Where the conduct of persons is inquired into, and their motives scrutinized, an incorrect or fraudulent motive will never be presumed or inferred, when the act is compatible with a correct and proper one.” See Fonblanque’s Equity, Tit. Fraud. Now, admitting the power of the chancellor to interpose as this court has directed in the present case, and I would be willing to rest its decision on this single principle. This is not pretended tobe a case of fraud in fact, but in law, whereby the defendants resorted to such means as had that effect. Or in other words, the' defendants are charged with using legal means to a fraudulent end. This brings us at once to the git and true character of this singular species of fraud. Is a party defending, justly chargeable with fraud in his use of legal remedies, when he resorts to neither artifice, device or fraud, in their employment? Upon such, as the only grounds of fraud, can a court of chancery in this country overhall the proceedings of a court of law, and deprive a party of an advantage he has obtained through his legal de-fence therein? These are questions which the court has answered affirmatively in the present case; and as I contend, thereby established a principle of chancery jurisdiction among us, not only contrary to the *296 spirit and policy of our statutes, but heretofore disa* vowed by this court in similar, cases. This constructive fraud, resting on no positive facts, but derived from inferences of law, as drawn by a court of equity, may be justly compared to the Laesas Majestas of the Roman law, or the constructive treason of the days of Charles the Second. It means any thing which a chancellor may choose to pronounce, and has no established rules or fixed laws to support it. It is asserted in perfectly arbitrary discretion, and its doctrine maintained by what every one must admit to be a legal paradox. Upon what principle does a court of chancery, granting it the power to review the proceedings of a court of law, decide the defence of a party to have been fraudulent, where in all instances it simply followed the law and was sustained by its authority? Are not all. good actions allowed to have good motives, and does not the law, which we can but presume, good while in force, fix the same motive on those who conform to its mandates'? Then how can a court of chancery attach fraud to the intentions of parties in pursuing legal acts, when the law itself fixes in them a different motive? The motive, in such a case, must follow the act. This is the legal presumption, as well as the moral, and the chancellor cannot depart from it on the ground of a mere contrary presumption. Nay, according to the rule above recited, it would be irrational and iniquitous in him so to do. Where the law gives to the acts of one a good and correct motive, nothing short of proof altogether full and conclusive, can resist the presumption of law. Simple inferences, derived from the consequences of these acts in a remote degree, can never be indulged’ to prove them bad. But if they are susceptible of a good motive, they shall be so considered, until it appears in fact that they were fraudulently designed and used, though of a legal character. In the absence then of all proof of artifice, device and fraud, which presumption does the law indulge in the present case; that the defence was intended to protect the rights of those who used it, or postpone the case until the demise should expire? There can be but one answer to this question.
Petition,
It is not believed that the British Chancery, in any cases like the present, has extended its review beyond the grounds of actual fraud; but that, as this court has *297 ’heretofore observed, it has been confined to cases that reach the conscience; and the legal bar has only been broken, when it would have been unconscientious not so to have done. Whether this court’would even go thus far, in reviewing the proceedings of a court of law, is left in doubt. In the case of Bowman and Violet above referred to, the court remarks: “It is admitted that cases can be found in the English Chancery, where courts of equity have interfered to control the evidence, pleas and controversies set up in suits at law, on the ground that the defence made, or advantage attempted to be relied on, was uncon-scientious and unjust under the circumstances of the •case, because the party had, by various devices, .got himself on the ground of that advantage.
pet¿t¡on
It is not necessary that we should name all those ■cases, or determine whether they can, or cannot, be all supported as law in this country. It is sufficient for us to ascertain whether that power, if it exists in the chancellor, ought to be exercised in favor of parties demanding the possession of the soil by virtue of an adverse entry, survey and grant, under the laws existing in this state, against another claiming under a similar title.
It must be remembered that-our titles in this country, although derived from the same government, are Independent of, and not in the slightest degree connected with each other. Nothing on the face of one, Intimates that there is another; but the contrary is rather to he infered, and by tracing it to the root, no indication is given that there is danger. The holder may settle honestly and unsuspiciously, till his home is demanded, after a length of time, by another holding a title precisely similar. Each party appears honestly and innocently to have come to their present situation. No priority, or intentional wrong from one to another, can be supposed or implied, to give the least base of equitable relief. They hitherto have been entire strangers. One is the possessor a length of time; the other is out of possession; and in other respects they appear to be on an equality, until their titles are scrutinized by legal skill, each is weighed in the judicial balance, and one is found wanting. It cannot, under these circumstances, be unconscientious in the *298 possessor to resort to all legal means within his power, to retain that possession, from which he must be ousted by a mere rigid ruleoflaw. If, in using all legal defences fairly, he at length comes into a situation where another rigid rule protects his possession, the chancellor ought not to interfere to unshield him.”
Petition.
It will be recollected,' that in the opinion rendered in this case the court has throughout considered and treated of the defence as uncons cientious, on the ground that the defendants were proceeding against their own convictions of right, as demonstrated, in the opposition which they continued. It has been heretofore noticed, that the court erred in taking it for granted that a demonstration of the plaintiffs right had been made in equity; and in the foregoing case it is declared thatin a proceeding at law, ‘‘it cannot be unconscientious in the possessor to resort to all legal means within his power to retain that possession, from which he must be ousted by a mere rigid rule of law.” Of course, the exhibí lion of an elder patent in the hands of a demanding claimant, does not impose on the possessor any conscientious obligations to surrender his home, or bar him from the use of all the legal means of defence. Having been pronounced strangers, asserting separate and independent rights, and no obligation resting on the one or the other to yield, conscience is foreign to the controversy, unless it be invoked by a resort to artifice, device or fraud, in the use of legal remedies.
One of the leading principles on which the British Courts of Chancery have interfered in cases of this kind, is, to prevent an advantage gained at law from being used against conscience. And the condition, that they would not interfere to take from one in favor of another that which would be a defence at law, unless on what is called good conscience, has been constantly observed. Butin all the cases referred to, one of .two traits is uniformly presented; either, relations of conscience are traced to the origin of the controversy, or imposed by the improper use of legal remedies. Here, nothing of the kind is presented. The claims are without connection in their origin and independent, and the use of Jegal remedies has been open, fair, and uninfluenced by fraud or device. It may be -necessary here to advert to another partof the opinion, *299 in this same cáse of Bowman and Yiolet, on which the court seems to have rested the power and propriety of interference, in the present case. It is as follows: “But it is equally true that pending either the injunction or appeal, Bowman, by an application to the court, might have compelled him to consent to an extension of the demise, orto the discharge of the injunction, so that he'might enter. So when he claimed payment for his improvements, the court might have refused his claim, till he made the judgment operate by an extension of the demise.”
e 110"*
The power of the circuit court to have done part of these things, is unquestionably denied in the case of ©wings and Marshall; and I do not consider the law as settled long since in that case, to be changed By what is here said. If the circuit court in a case of ejectment, has no power over the demise, after judgment, at the instance of the plaintiff, how can it be acquired by the defendants having his legal rights as secured by law? To both the appeal and commissioners to value improvements, he is entitled by statute; and if he thinks fit to enjoy either of those rights, he does not thereby confer authority to the court, to do what it otherwise had no power to perform. I again repeat, after judgment rendered, the circuit court, as a court of law, had no power overlhe demise in this case. And then the question immediately arises. Had the same judge, sitting-as a court of chancery, further or greater power over the demise, than he possessed while sitting as a court of law ? Has a court of chancery in this country, ever taken upon itself to dispense with any of the positive rules of law, in its proceedings and decrees? These are questions of great moment, particularly as relates to the principles involved in this case; and in their decision, calculated-to give full character and effect to the future operation of our land law. With' us, the discretion of the chancellor has never heretofore exceeded the settled rules of law. Such a discretion, would place him above all legislative authority, and make him indeed a despot l
According to Blackstane, who gives us though a suc-einct, probably the most luminous definition of the relative powers of the courts of common law and chancery-, the- systems of jurisprudence in courts of both. *300 law and equity, are now equally artificial systems,, founded in the same principles of justice and positive law. “The rules of property, (says he) rules of evidence, and rules of interpretation in both courts are, orshouldbe; the same: both ought tobe the best, or must cease to be courts of justice.” The power of each court is not only regulated by positive law, but in no instance does the one, attempt to supervene upon the authority and jurisdiction of the other. Their essential difference is said principally to consist in the different modes of administering justice in each; in the mode of proof, the mode of trial, and the mode of relief. Under those different modes of proceeding, it is not competent for the chancellor to act according to his own opinion, astounded on the circumstances of each particular case; but he is governed by fixed rules, and bound down by established law, although in some cases it may operate unequally and severely. It is a maxim that equity follows the law; and the same enlightened" author further remarks on this subject; “And certainly, if a court of equity were still at sea, and floated upon the occasional opinion which the judge who happened to preside might entertain of conscience in every particular case, the inconvenience that would arise from this uncertainty, would be a worse evil than any hardship that could follow from rules too strict and inflexible. Its powers would have become too arbitrary to have been endured in a country like this, which boasts of being governed in all respects by law, and not by will.” Similar views, of the power and jurisdiction of courts of equity, have been frequently taken by this court. In the case of Marshall and Craig, I Bibb, it is remarked that, “The same rules of decision govern both courts; the former (a court of equity) cannot any more than the latter, decide in opposition to legal principles, in a case to which those principles are applicable; to do so, would be an assumption of an arbitrary discretion, as pernicious to the best interests of the community, as it is contrary to the fundamental principles of our government. Even those rules of law, which in their nature, are technical and positive, cannot be disregarded by a court of equity.”
Petition.
An ejectment is not a proceeding in chancery, but peculiar to a court of law, and in the use of this reme *301 ¿y it is a settled rule, that a demise cannot be lengthened after judgment. According then to the princi-’ pies and authorities referred to, how can a court of equity after acquiring jurisdiction of the same case, dispense with the positive rule of law, and exercise a discretion in contradiction to it? I grant, the chancellor might have power over his own injunction, and arbitrarily discharge it if he thought fit, however repugnant to equity and justice. But he would have none over the demise; nor any power to construe, or administer the law in relation to it, differently from a court of law. It certainly will not be contended that the chancellor, after-judgment in ejectment, has the power to lengthen a demise on application by bill for that purpose at the suit of the plaintiff. If he has no control over it in this state of case, why take it when the defendant comes in by bill to injoin the judgment? It is answered, the circumstances of the case and situation of the parties, call on him to do so. But, will he not still be dispensing with a positive rule of law, and exerting a power forbidden to the common law judge? He is here, not only in the wide sea of discretion without law to direct his course, but taking upon himself to decide as if the other court judged without equity, and he not bound by any law. It is not denied but that there are exceptions to the general rule of equity’s following the law. But, they are said to arise only in cases of fraud, trust and accident. These exceptions then, would bring the chancellor back to the very ground we have been reviewing. In a case, where the plaintiff in ejectment had filed his bill praying that his demise might be extended, on the ground that he had been unreasonably delayed by the defence, or, where the defendant had injoined a judgment against him, and the plaintiff moved to discharge it on the ground that the demise in his declaration was about to expire. The chancellor would immediately say, ‘Over the demise I have no control; it was laid in the suit at law at the discretion of the plaintiff, and is governed by fixed rules, applicable as well to this court, as the one in which he brought his suit. The Court of Appeals has said, in the case of Rice’s heirs vs. Lowan, II Bibb, that a judgment in ejectment, although stayed by an injunction on the part of the defendant till the plaintiff had to bring a second suit for *302 the same land, does not stop the running of the statute of limitation, betwixt the-parties: So I consider would be-the running of time under a demise; and that a court of chancery would have no greater power to stop that, than to interpose a condition against the progress of the statute of limitation. Both are under rules of positive law. If the defendant has re* sorted to artifice, device or fraud, bj which he has perverted the legal remedies to the plaintiffs disadvantage, and thereby prevented him from entering: under his judgment, I will grant him- relief- upon positive proof of these facts... Otherwise, there is nothing to.take his ease out of the rules of law; and he must abide the consequences of not having fixed his term, at a period, which would not overreach the time that his cause by fair management, and without fraud*, could be kept from a final decision..”
Petition
Petition.
In the present case, Vdo-mot consider the court in the opinion which has been rendered, to have assumed the groand, that a court of chancery can dispense with the force of positive limitations. Such a doctrine, I believe, has never been even contended for in Kentucky at the bar, much less received the sanction of any of our courts.. It would indeed- place the chancellor on high ground, and enable him to put every other department of government at defiance. All our legislative provisions, limiting- the right of entry, or right of action in every case, would remain bufas dead letter in the statute book, under his paramount authority and discretion. I must, therefore, take it for granted, that this court never designed to rest any part of their opinion, in this case, on their judicial right to exercise any such chancery powers. Previous decisions are not only against it, but it is at war with every principle of fixed and limited authority. The effects of our statutes of limitation cannot be con-troled or dispensed with. Where, by their free and uninterrupted operation, they have vested rights,those-rights are not merely secured in judicial recognition-, but they become sacred under a constitutional guarantee. A court of chancery might j ust as well decree a man’s estate from him without shadow of claim, as to do so in disregard of any of our positive statutes of limitation. They are not only our means of security, but when they have had their operation, they consti *303 tute our evidences of right and title. I then repeat, this court never could have intended to direct the court below,to enter a positive decree in favor of the plaintiffs for the land in controversy, after the statute had ran betwixt twenty and thirty years in favor of the defendants, who during all this time have been occupants of the freehold; but, merely designed to give the plaintiffs the advantage of their judgment in ejectment in the circuit court, and allow them to ..enter, after their term had expired. In this, although the proceeding does not strike as boldly at established precedents and principles, there is the same danger as if the court had disavowed any respect for the positive statutes of limitation, because, the practice cannot be maintained without the grossest inconsistency in the application of legal remedies, and breaking down the fixed rules of law under the supremacy of the chancellor.
petilioll
The court seems to think that, as the defendants in this case first went into chancery,, they thereby gave to the plaintiffs a right to call on the chancellor to settle the whole controversy, and take upon himself the final adjudication of the case. Be it so. But does this authorize the chancellor to do what he has no power to perform? Certainly not. The court must see the dilemma to which this proceeding inevitably leads. A peremptory order to, the court below, that a writ of possession for the land as under a decree in chancery, is not ventured in the opinion. And why? Because, this would be to give one man’s land to another, in defiance of positive law protecting bis rights and possession, to the contrary. It is said, “It would have been right to do so, had not the right of entry of Shan-nons heirs under their patent been barred by lapse of time; but they had no right of entry, except under their judgment in ejectmentNow, I do not consider the court either, to have taken upon itself absolutely to order an extension of the plaintiffs demise. This course is equally forbidden with the other. “All therefore, (in the language of the court) that the plaintiffs can in justice demand, is, to have a decree for a writ of habere facias possessionem, unless the heirs of Simpson shall consent to an extension of the demise, for such period as the plaintiffs in error may think proper to insert. Wei), the heirs of Simpson .will give no such *304 consent. Then, the chancellor will direct that a writ of habere facias possessionem shall issue in favor of the plaintiffs upon their judgmentin ejectment. And what does that go for? Their term unexpired and yet to come. But their term is already expired, and cannot be lengthened; and moreover, this court has not attempted, had it the power, to change either the nature of the remedy by ejectment, or the character and force of a writ of possession which issues upon a judgment in that action.
¡Petition.
It is respectfully premised that all these things grow out of an irreconcileable and dangerous authority which is confered on the chancellor by the opinion rendered in this case.
A re-hearing is therefore solicited.